IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

PEGGY C.,

      **Plaintiff,**

v.                             **Case No.: 3:23-cv-00120**

MARTIN J. O'MALLEY,
Commissioner of the
Social Security Administration,[1]

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's

---

[1] Commissioner O'Malley was sworn in on December 20, 2023, replacing Acting Commissioner Kilolo Kijakazi. Per Fed. R. Civ. P. 25(d), O'Malley was automatically substituted as Defendant in this action.

request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On November 16, 2020, Plaintiff Peggy C. ("Claimant") protectively filed for DIB, alleging a disability onset date of August 18, 2020 due to "broken leg, low mobility, asthma, Hashimoto's, vertigo, anxiety, chronic fatigue, and sleep apnea." (Tr. at 210, 227). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on July 15, 2022 before the Honorable Nathan Brown, Administrative Law Judge (the "ALJ"). (Tr. at 64-92). By written decision dated July 29, 2022, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 42-63). The ALJ's decision became the final decision of the Commissioner on December 16, 2022 when the Appeals Council denied Claimant's request for review. (Tr. 1-9).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a Transcript of the Administrative Proceedings. (ECF No. 6). Claimant filed a Brief seeking judgment on the pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a reply, (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 60 years old on her alleged disability onset date and 62 years old on the date of the ALJ's decision. (Tr. at 103). She completed high school, communicates in English, and previously worked as a pawn broker. (Tr. at 87, 226, 228).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"), found at 20 C.F.R § Pt. 404, Subpt. P, App. 1. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is

deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a mental disorder described in the Listing. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2025. (Tr. at 47, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 18, 2020, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: obesity, vertigo, osteoarthritis, degenerative disc disease, asthma, obstructive sleep apnea (OSA), fibromyalgia, and bursitis. (Tr. at 48, Finding No. 3). The ALJ also considered Claimant's diagnoses of gastroesophageal reflux disease (GERD), vitamin D deficiency, sebaceous cysts, hypothyroidism, COVID infection, bronchitis, segmental dysfunction of the pelvic region resulting in incontinence, depressive disorder, generalized anxiety disorder, and panic disorder, but the ALJ found that the impairments were non-severe. (Tr. at 48-50). The ALJ concluded that Claimant's

headaches were not a medically determinable impairment. (Tr. at 50).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 50-52, Finding No. 4). Thus, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) except the claimant can climb ramps and stairs occasionally, climb ladders, ropes, or scaffolds never, balance frequently, stoop frequently, kneel frequently, crouch frequently, and crawl occasionally. The claimant can work at unprotected heights occasionally, around moving mechanical parts occasionally, in atmospheric conditions frequently, in extreme cold frequently, and in vibration frequently.

(Tr. at 52-58, Finding No. 5).

At the fourth step, the ALJ concluded that Claimant could perform her past relevant work as a pawn shop clerk. (Tr. at 58-59, Finding No. 6). Consequently, the ALJ decided that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 59, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts several challenges to the Commissioner's decision. First, she asserts that the RFC finding is defective for the same reasons identified in *Dowling v. Comm'r of SSA*, 986 F.3d 377 (4th Cir. 2021) because the ALJ conflated the RFC assessment with his evaluation of Claimant's symptoms. (ECF Nos. 10 at 3-4, 10; 14 at 5). In her second challenge, Claimant argues that the ALJ erred by not including any mental limitations in the RFC finding or explaining why no mental restrictions were warranted, although the ALJ found mild functional limitations at step two of the sequential evaluation. (ECF Nos. 10 at 1, 2-7; 14 at 1-5). Third, Claimant argues that the ALJ did not appropriately evaluate her subjective complaints as he relied on certain evidence to the

exclusion of contrary evidence and required objective evidence of pain and fibromyalgia. (ECF Nos. 10 at 1, 7-16; 14 at 6-7).

In response to Claimant's challenges, the Commissioner contends that substantial evidence supports the ALJ's finding that Claimant's non-severe mental impairments did not result in any functional limitations. (ECF No. 13 at 11-15). Also, the Commissioner argues that the ALJ's RFC assessment accounted for the total limiting effects of Claimant's impairments and considered her subjective complaints. (*Id.* at 15-18).

## V.   **Relevant Evidence**

The undersigned thoroughly examined the entire record. The evidence that is most pertinent to Claimant's challenges is summarized below.

### A. *Treatment Records*

On August 17, 2020, Claimant presented to MedExpress Teays Valley after falling and twisting her right ankle. (Tr. at 318). Her x-ray showed a closed fracture of the right fibula. (Tr. at 319). She was placed in an air cast, given crutches, and advised to follow up with a specialist. (*Id.*). Orthopedic surgeon Chad Lavender, M.D., examined Claimant the same day. Claimant related to him that she was walking out of her back porch in the morning when she slid and tripped. (Tr. at 482). Dr. Lavender recommended an open reduction internal fixation of Claimant's right distal fibula. (Tr. at 483). He placed Claimant in a splint and planned to perform surgery the following week if her swelling decreased. (*Id.*).

Due to continued swelling and pain complaints, an ultrasound was performed on Claimant's right lower extremity on August 24, 2020 at Charleston Area Medical Center. (Tr. at 329). The study was negative for deep vein thrombus. (Tr. at 331). Claimant followed up with Dr. Lavender on September 29, 2020. He noted that Claimant was still

too swollen to undergo surgery on her ankle. (Tr. at 459). She was now wearing a cast and tolerated it well, although the swelling persisted. (*Id.*). Claimant was non-weightbearing at that point. (*Id.*). Dr. Lavender referred Claimant to another orthopedic surgeon in his practice, Thomas Emmer, M.D. (Tr. at 457). On October 5, 2020, Dr. Emmer and resident physician William Fravel, M.D., recorded that Claimant did not have any specific ankle pain or tenderness, but she was not ambulating or bearing any weight. (Tr. at 457). During follow up on October 19, 2020, Dr. Emmer and Dr. Fravel noted that Claimant was doing quite well in terms of her ankle fracture. (Tr. at 453). There was some stiffness to dorsiflexion and plantarflexion of the ankle, but she did not have any pain, tenderness, or swelling in her right lower extremity, and her sensation was intact. (*Id.*). Claimant was wearing a Cam walker boot and used ambulatory devices to avoid falling. (*Id.*). Dr. Emmer and Dr. Fravel advised Claimant that she had no restrictions and could transition to an ankle brace for added stability as she recovered. (Tr. at 454). They prescribed physical therapy. (*Id.*).

On November 18, 2020, Claimant presented for an initial physical therapy examination regarding right ankle pain and stiffness when walking. (Tr. at 426). She was not using an assistive device, but she ambulated with a moderate limp on the right side. (*Id.*). Claimant claimed that standing and walking aggravated her symptoms, and she could only stand for one hour before needing a break. (*Id.*). Her swelling persisted, but it was less severe than when she was in a cast. (*Id.*). Claimant followed up with Dr. Emmer on January 18, 2021. He concluded that Claimant's ankle healed in a malunion. (Tr. at 449). Claimant stated that she was not doing very well and had pain in her ankle with weightbearing or prolonged activity. (*Id.*). She asserted that she was unable to return to work and filed for disability. (*Id.*). Dr. Emmer believed that surgical intervention would

8

not be effective at that point, so he planned to treat Claimant symptomatically. (Tr. at 449-50). He prescribed physical therapy and anti-inflammatory medication. (Tr. at 450).

Claimant saw her primary care physician, Terrence Triplett, M.D., on March 18, 2021. She was using a CPAP machine for sleep apnea, which improved her fatigue. (Tr. at 520). Claimant denied left hip pain, but complained that her left knee seemed to give out and was painful. (*Id*.). She also mentioned that she sometimes had facial rash, redness, and warmth. (*Id*.). Her previous primary care physician reportedly planned to test her for lupus regarding those symptoms, but he never got around to it before he retired. (*Id*.). Dr. Triplett recorded that Claimant's asthma, sleep apnea, vitamin D deficiency, and generalized anxiety were stable. (Tr. at 522). He renewed Claimant's medications and ordered an ANA test to evaluate possible lupus. (*Id*.).

On March 23, 2021, after completing 32 physical therapy sessions, Claimant reported 80 percent improvement in her right ankle symptoms. (Tr. at 358). The following month, on April 12, 2021, Dr. Triplett referred Claimant to rheumatologist Matthew Samuel, M.D., regarding a positive ANA test. (Tr. at 514). Dr. Samuel believed that Claimant likely suffered from fibromyalgia because she did not have the clinical features of lupus. (Tr. at 519). However, he ordered further testing to confirm. (*Id*.). Claimant followed up with Dr. Emmer on April 19, 2021 regarding her right ankle. (Tr. at 443). The fracture was healed, and she was weight-bearing as tolerated and not using any assistive device or special footwear. (*Id*.). Claimant expressed that she had some continued pain and swelling, and she was not fully satisfied with the outcome. (Tr. at 443-44). Dr. Emmer explained that the soft tissue would heal, and Claimant would continue to feel better over the course of the year. (*Id*.).

Claimant returned to Dr. Samuel on April 26, 2021. He again explained to her that,

despite the fact that her blood test was positive for ANA antibodies, she did not have any of the clinical features to suggest an autoimmune disease, especially lupus. (Tr. at 512). Dr. Samuel opined, based on his examination of Claimant and her history, that she had fibromyalgia. (*Id.*). Claimant was already taking Lexapro. (*Id.*). Dr. Samuel suggested substituting Cymbalta in its place or adding Lyrica and having her thyroid antibodies checked. (Tr. at 512-13). Claimant was advised to return if she developed any joint pain with swelling, oral ulceration, or skin rash. (Tr. at 513). Dr. Samuel did not see any reason at that time to start Claimant on any additional medications unless she developed new, clinically documented symptoms. (*Id.*).

On June 1, 2021, Dr. Triplett noted that Claimant was doing well. (Tr. at 500). He considered Dr. Samuel's recommendation regarding medication changes, but he was hesitant to discontinue Lexapro because Claimant was doing so well on it. (*Id.*). Instead, Dr. Triplett renewed Claimant's prescription for Lexapro and added Gabapentin. (*Id.*). During follow-up with Dr. Samuel on July 19, 2021, Claimant complained of thinning hair and constant pain in her left elbow, hip, knee, and hands. (Tr. at 490). Dr. Samuel diagnosed her with raised antibody titer per immunology studies, primary generalized osteoarthritis, and fibromyalgia. (Tr. at 494).

Dr. Emmer documented on August 16, 2021 that Claimant's right ankle was healed, and she was doing well from that standpoint. (Tr. at 441). Her hips and legs felt "a bit weak," and she had some pain in her left hip. (*Id.*). X-rays of Claimant's hip were unremarkable with no evidence of fracture, dislocation, or any significant degenerative changes. (*Id.*). Dr. Emmer diagnosed Claimant with trochanteric bursitis and general deconditioning of the hip, particularly in her abductor muscles. (*Id.*). He prescribed physical therapy and anti-inflammatories. (Tr. at 441-42). On September 20, 2021, Dr.

Emmer and resident physician Collin Lamba, M.D., again recorded that Claimant's right ankle fracture healed without surgery, and she was doing well. (Tr. at 438). She denied any pain in her right ankle. (*Id.*). The reason for Claimant's visit was left trochanter bursitis. (*Id.*). She experienced about 50 percent improvement in her hip pain with physical therapy and Mobic, but she developed increased pain after stepping over a creek. (*Id.*). On examination, Claimant had tenderness and inflammation in the left greater trochanter region, but normal alignment, no pain with range of motion testing, intact sensation, and normal motor examination. (*Id.*). Claimant was continued on anti-inflammatory medication and physical therapy and given a steroid injection. (Tr. at 439). Claimant completed 10 physical therapy sessions for her left hip pain over the course of approximately one month, ending on September 30, 2021. (Tr. at 595). Claimant was disappointed that her insurance company did not approve more visits. (*Id.*). She noted that her hip felt a little better the past couple of days. (*Id.*).

During follow-up with Dr. Triplett on October 5, 2021, Claimant's obesity and fibromyalgia were listed as uncontrolled. (Tr. at 489). Her hypothyroidism and generalized anxiety disorder were controlled. (*Id.*). Dr. Triplett wanted Claimant to try a low carbohydrate diet. (*Id.*). On November 1, 2021, Dr. Emmer documented that Claimant's trochanteric bursitis largely resolved, primarily due to simple ibuprofen. (Tr. at 705). Claimant had some residual stiffness in her right ankle, but no swelling, full range of motion and strength, and intact sensation. (Tr. at 705-06). She said that her ankle was not that bothersome. (Tr. at 706). Claimant returned to Dr. Triplett on December 30, 2021 for lumbago with left-sided sciatica. (Tr. at 568). Her x-ray showed mild degenerative changes in her lumbar spine for which Dr. Triplett prescribed prednisone and Flexeril. (Tr. at 570).

On March 18, 2022, Dr. Samuel recorded that Claimant denied joint pain with swelling, oral ulceration, or skin rash. (Tr. at 656). Claimant was already prescribed a muscle relaxant from Dr. Triplett and other medications for chronic pain, so Dr. Samuel did not prescribe anything further. (Tr. at 656, 661). Claimant told Dr. Triplett on April 5, 2022 that her biggest problem was stress over the recent death of her father. (Tr. at 649). Laboratory testing the prior month was normal, and her "lupus" was not active. (*Id.*). Dr. Triplett also found that Claimant's hypothyroidism, fibromyalgia, and anxiety were stable. (Tr. at 651).

On April 28, 2022, Claimant presented to Christina E. Lawrence, Psy.D., for a follow up behavioral health evaluation for potential bariatric surgery. Dr. Lawrence cleared Claimant for surgery, noting that Claimant's depression symptoms were mostly related to sleep as opposed to low mood or anhedonia, and her anxiety was mostly controlled by medication. (Tr. at 625). Claimant noted that she had even increased her exercise regimen in anticipation of surgery. (Tr. at 624). She was previously walking a few times per week for periods of 15 to 30 minutes, whereas she was now walking every other day for periods of 30 to 45 minutes for distances between one and two miles. (*Id.*). Amy Garmestani, M.D., also cleared Claimant for surgery from an orthopedic standpoint on August 20, 2023. Dr. Garmestani noted that Claimant did not have any proximal swelling. (*Id.*).

### B. Evaluations, Opinions, and Prior Administrative Findings

On March 2, 2021, psychologist Mareda L. Reynolds, M.A., performed a mental status examination of Claimant. Claimant advised that her mood was usually good, and she did not have a lot of problems with panic attacks. (Tr. at 344). Her medication, Lexapro, reduced the intensity and frequency of her panic attacks from almost daily to

every couple of months. (Tr. at 344-45). On examination, Claimant was cooperative, alert, and oriented with euthymic mood and appropriate affect. (Tr. at 346). She conversed normally and could follow directions, explain her recent and remote personal history, repeat six digits forward and four digits in reverse, and remain on task/topic as long as needed. (*Id*.). Claimant reported that she prepared meals, drove occasionally, visited her parents and assisted them with their medication, watched television, did laundry and dusted, completed personal hygiene tasks without assistance, and communicated with others on social media. (*Id*.). On March 10, 2021, James Binder, M.D., assessed that Claimant had mild limitations in all of the paragraph B criteria. (Tr. at 110). He elaborated that her concentration, persistence, recent memory, and social functioning were normal or mildly impaired. (Tr. at 111). Timothy Saar, Ph.D., affirmed this assessment on August 20, 2021. (Tr. at 123).

On March 13, 2021, Karen R. Jewell, APRN, performed an internal medicine examination of Claimant. When asked what prevented her from working, Claimant cited her broken ankle, sleep apnea, and fatigue. (Tr. at 349). Claimant used a cane, but she ambulated from the chair to the examination table without difficulty and without use of the cane. (Tr. at 350). Her gait was steady, and she did not have trouble without the cane. (*Id*.). Nurse Jewell opined that Claimant likely did not need to use it. (Tr. at 352). Claimant followed commands without issue and displayed good effort. (Tr. at 350, 352). Her muscle strength, sensation, reflexes, and range of motion were intact. (Tr. at 351-52). Nurse Jewell diagnosed Claimant with asthma, Hashimoto's disease, vertigo, chronic fatigue, sleep apnea, and history of ankle fracture. (Tr. at 352). On April 7, 2021, Rabah Boukhemis, M.D., assessed that Claimant could perform light exertional work that involved occasional climbing and crawling; frequent balancing, stooping, kneeling, and

crouching; and no concentrated exposure to extreme cold, vibration, pulmonary irritants, or hazards. (Tr. at 112-14). Narendra Parikshak, M.D., affirmed this assessment on August 19, 2021. (Tr. at 123).

### C. Claimant's Statements

During her administrative hearing on July 15, 2022, Claimant testified that she still experienced ankle pain when she woke up, stood, or walked. (Tr. at 71-72). She claimed that she could only walk one-quarter of a mile or stand for 30 minutes before needing to sit down due to ankle pain. (Tr. at 72). Claimant applied ice to her ankle and rested to alleviate the pain. (*Id.*). Claimant also reported osteoarthritis pain in her knees and left hip. (*Id.*). She stated that she sometimes felt unsteady due to her left hip issue. (Tr. at 73). Claimant further testified that she felt pain, soreness, and stiffness in her fingers; used a Singular inhaler for asthma; experienced back pain that she treated with a heating pad and Advil; and had thyroid symptoms, including being tired, nervous, and irritable. (Tr. at 73-76). Claimant alleged that she was tired in the morning due to sleep apnea, which made it hard to concentrate or remember things and required her to rest during the day. (Tr. at 77-78, 80-81). She allegedly suffered from daily urinary incontinence and occasional fecal incontinence due to pelvic segmental dysfunction. (Tr. at 78-79). However, Claimant explained that she did not have to wear protective undergarments and never had any accidents at work. (Tr. at 86). Claimant reported suffering from six episodes of vertigo per year which took her out of commission for the whole day and six to eight panic attacks per year that lasted approximately 30 minutes. (Tr. at 79-80, 82). She could supposedly only sit for 20 minutes before needing to move around because she would become too stiff to get up, and she could only lift 10 to 15 pounds. (Tr. at 74, 77).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

All of Claimant's challenges concern the RFC assessment and subjective symptom analysis. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations

resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.*

According to SSR 96-8p, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g.

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 404.1529 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to

produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id*. § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an

individual's allegations. *Id.*

> In *Hines v. Barnhart*, the Fourth Circuit stated that:
>
> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

### A. Dowling

Claimant argues that the ALJ's RFC assessment is deficient for the reasons expressed in *Dowling*, 986 F.3d at 387. (ECF No. 10 at 3-4). According to Claimant, the ALJ improperly conflated the RFC assessment with the evaluation of symptoms, treating them as one and the same. (ECF No. 14 at 5). In *Dowling*, the Fourth Circuit concluded that the administrative law judge relied on an incorrect regulatory framework when he assessed the claimant's RFC. *Dowling*, 986 F.3d at 388. The Court explained:

> [The ALJ] did not cite to 20 C.F.R. § 416.945, the section of the Code of Federal Regulations that is titled "Your residual functional capacity" and explains how ALJs should assess a claimant's RFC. Nor did he cite to SSR 96-8p, the 1996 Social Security Ruling that provides guidance on how to properly evaluate an RFC. Finally, the ALJ did not indicate that his RFC assessment was rooted in a function-by-function analysis of how Appellant's impairments impacted her ability to work. Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of [a claimant's] symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [ ] record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the

alleged severity of those symptoms is supported by the record, is relevant to the RFC evaluation. *See* 20 C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should consider "limitations that result from [the claimant's] symptoms, such as pain"). But an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same.

*Id.* at 387.

The ALJ's decision in this case is plainly distinguishable from the foregoing decision in *Dowling*. Here, the ALJ identified the correct regulatory framework for assessing Claimant's RFC earlier in the decision. (Tr. at 47) (discussing 20 C.F.R. §§ 404.1520(e), 404.1545 and SSR 96-8p). More importantly, although the ALJ did not repeat those sources in the RFC portion of the decision, he very clearly performed a thorough function-by-function analysis and logically connected the evidence to each RFC limitation that he assessed. *See, e.g., Michelle T. v. Kijakazi*, No. 2:23-CV-00176, 2023 WL 5811259, at *11 (S.D.W. Va. Aug. 17, 2023), *report and recommendation adopted,* 2023 WL 5804316 (S.D.W. Va. Sept. 7, 2023) (finding no error when the ALJ only cited the RFC framework in a "boilerplate introductory section" of the decision, but nonetheless performed the functional analysis); *Davis v. Comm'r of Soc. Sec.*, No. 3:20-CV-00339-RJC, 2022 WL 680211, at *4 (W.D.N.C. Mar. 7, 2022) ("Here, the ALJ, like the ALJ in the *Dowling* case, did not cite to 20 C.F.R. § 416.945 or SSR 96-8p. However, unlike the ALJ in the *Dowling* case, the ALJ here went through a function-by-function analysis. [...] The ALJ supported his functional analysis with medical and other record evidence. Tellingly, Plaintiff failed to identify any specific functional area that the ALJ failed to address and instead relied on generalized, conclusory arguments. Thus, to the extent the ALJ's analysis is deficient in some way by, for example, not citing to the correct source, there is no per se rule for remand and such error is harmless as the ALJ went through a function-

by-function analysis as required by the framework and Plaintiff failed to specify a non-harmless error."); *Elizabeth T. v. Kijakazi*, No. CV 21-1046-BAH, 2022 WL 2649055, at *3 (D. Md. July 8, 2022) ("I also do not find this case to be similar to *Dowling*. In *Dowling*, the Fourth Circuit found error in an ALJ's RFC assessment because the ALJ failed to engage in a "function by function" analysis as required by controlling precedent. [...] Unlike *Dowling*, the ALJ here engaged in a lengthy "three step process" by considering all of Plaintiff's impairments, providing a sufficient narrative discussion regarding each, and making a finding as to the Plaintiff's RFC.").

In this matter, the ALJ meticulously documented his analysis of Claimant's allegations, clinical records, test results, consultative examination, prior administrative findings, daily activities, and other evidence. (Tr. at 52-58). The ALJ specifically considered the evidence bearing on Claimant's ability to carry, lift, sit, walk, stand, and perform other relevant functions. (*Id.*). The ALJ articulated the basis for the RFC findings based on that functional analysis. For instance, the ALJ explained that Claimant's vertigo symptoms reduced her to frequent balancing; never climbing, ropes, and scaffolds; and occasionally working at unprotected heights and around moving mechanical parts. (Tr. at 54). In addition, the ALJ discussed that Claimant's combination of musculoskeletal impairments and fibromyalgia supported reducing her to light work to prevent increased pain in her lumbar spine or joints associated with lifting or carrying weight. (Tr. at 56). The ALJ proceeded to connect each of the exertional and non-exertional limitations to the evidence of Claimant's impairments. (Tr. at 56-58). The ALJ also explained his consideration of the opinion evidence and prior administrative findings and how that evidence factored into the RFC finding. (Tr. at 57-58).

Therefore, there is no merit to Claimant's argument that the RFC assessment

suffers from the same flaws that the Fourth Circuit identified in *Dowling*. The ALJ performed a "separate and distinct" RFC analysis, which was not based entirely on his evaluation of the intensity, persistence, and limiting effects of Claimant's symptoms. The ALJ explicitly connected the evidence, on a function-by-function basis, to the RFC findings. Consequently, the undersigned **FINDS** that the ALJ utilized the correct regulatory framework in assessing Claimant's RFC.

### B. Mental RFC

Claimant contends that the ALJ erred by not assessing RFC restrictions to account for her mild mental limitations or explaining why restrictions were not warranted. As discussed, the ALJ applies a special technique to evaluate mental impairments, which includes rating the severity of functional limitations in the "paragraph B" categories of (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself. The ALJ uses a five-point scale, ranging from no, mild, moderate, marked, and extreme limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(a)-(e). As relevant here, a finding of "no limitation" reflects that the claimant is able to function in that category area "independently, appropriately, effectively, and on a sustained basis" whereas a finding of "mild limitation" means that the claimant's ability to do so is "slightly limited." *Id.* at § 12.00F(2)(a), (b).

In this instance, the ALJ applied the special technique to consider Claimant's mental functional limitations. He found that Claimant was mildly limited in the areas of concentrating, persisting, or maintaining pace and adapting or managing herself, but she had no limitations in the other paragraph B criteria. (Tr. at 49). The ALJ noted that Claimant did not display objective abnormalities in concentrating, persisting, or

maintaining pace during her consultative examination or medical appointments, but he credited her subjective reports of difficulty concentrating due to fatigue. (Tr. at 49). Regarding adapting or managing herself, the ALJ cited that Claimant was able to manage her finances, help her parents with medications, drive, go out alone, and perform other activities. (*Id*.). However, the ALJ accounted for the fact that Claimant had a history of panic attacks. (Tr. at 49-50). The ALJ noted that Claimant took Lexapro, which was largely beneficial, but she still had a panic attack every couple of months. (Tr. at 50). The ALJ ultimately determined that the evidence did not indicate that Claimant's mental impairments caused more than minimal limitation in her ability to perform basis work activities. (Tr. at 48, 50). In the RFC analysis, the ALJ explained that he found Dr. Binder and Dr. Saar's prior administrative findings persuasive to the extent that the experts found that Claimant did not have any severe mental impairments based on the lack of significant mental health deficits within mental status examinations. (Tr. at 57). For instance, the ALJ cited that Claimant's consultative psychological examination was generally unremarkable. (*Id*.).

Although the ALJ's discussion of Claimant's mental RFC is brief, the ALJ very plainly provided a logical bridge from the evidence to his conclusion that no mental RFC restrictions were warranted. The ALJ stated that Claimant's impairments did not cause more than minimal limitation in her ability to perform basic work activities, and he was persuaded by the state agency psychiatrist and psychologist's findings that Claimant's mental impairments were non-severe. While the step two severity finding is not a substitute for the RFC analysis, it provided the necessary insight, along with the ALJ's evaluation of the prior administrative findings and other evidence, to allow for meaningful review. *See, e.g., Kimberly B. C. v. Kijakazi*, No. 1:22CV617, 2023 WL

4974033, at *7-8 (M.D.N.C. Aug. 3, 2023). It should be noted that the ALJ's RFC discussion of Claimant's mental impairments, although it is not expansive, reflects the minimal mental health information in the record. Claimant primarily alleged physical symptoms and limitations during the relevant period. She received some treatment, consisting of medication, from her primary care provider for depression, anxiety, and panic disorder, which was reportedly effective in managing her symptoms. (Tr. at 344-46, 500, 522, 625, 651). There are no significant subjective complaints, mental source statements, prior administrative findings, or any other critical conflicting evidence that the ALJ failed to consider. The ALJ evaluated the available evidence and determined that Claimant's mild functional limitations in concentrating, persisting, or maintaining pace and adapting herself did not restrict her RFC.

This matter is distinguishable from recent cases in which this Court found that the ALJ's lack of explanation precluded meaningful review. The Court remanded several cases in which the ALJs did not discuss the claimants' mental impairments or mental functional limitations at all after step two of the sequential evaluation. *Dolly H. v. Kijakazi*, No. 2:22-CV-00573, 2023 WL 6566603, at *7 (S.D.W. Va. Aug. 31, 2023), *report and recommendation adopted,* No. 2:22-CV-00573, 2023 WL 6174413 (S.D.W. Va. Sept. 22, 2023); *Mary S. v. Kijakazi*, No. 2:23-CV-00302, 2023 WL 9007315, at *7 (S.D.W. Va. Aug. 24, 2023), *report and recommendation adopted,* No. 2:23-CV-00302, 2023 WL 9004929 (S.D.W. Va. Dec. 28, 2023); *Jones v. Kijakazi*, No. 5:21-cv-00634 (S.D.W. Va. Sept. 22, 2022), at ECF No. 18, *report and recommendation adopted*, *Jones v. Kijakazi*, No. 5:21-cv-00634 (S.D.W. Va. Nov. 28, 2022), at ECF No. 19; *Shank v. Saul*, No. 3:20-CV-00444, 2021 WL 2767063, at *8 (S.D.W. Va. June 11, 2021), *report and recommendation adopted,* No. CV 3:20-0444, 2021 WL 2744550 (S.D.W. Va. July 1,

2021). Unlike this matter, the ALJs in the preceding cases did not express that the prior administrative findings informed the RFC analysis. (*Id.*). In some of the cases, the ALJs found that the claimants were even more limited than the state agency experts assessed, yet the ALJs did not proceed to explain why those limitations did not translate into any RFC restrictions. *See, e.g., Dolly H.*, 2023 WL 6566603, at *7; *Mary S.*, 2023 WL 9007315, at *7.

Reading the ALJ's RFC discussion as a whole, the ALJ sufficiently explained that he assessed that Claimant with mild limitations in two of the paragraph B criteria based on her periodic symptoms of anxiety and need for medication management. (Tr. at 57). However, the ALJ did not assess RFC restrictions because Claimant's mental status examinations, including her unremarkable consultative examination, did not reflect any significant deficits. (*Id.*). The ALJ also mentioned Claimant's ability to drive, pay bills, watch television, shop in stores, supervise employees and interact with customers without reported issues. (*Id.*). Although the ALJ could have more robustly articulated his mental RFC findings, the deficiency is harmless in this case because his reasoning is still quite apparent from the decision and is supported by substantial evidence.

During her consultative examination in March 2021, Claimant was cooperative, alert, and oriented with euthymic mood and appropriate affect. (Tr. at 346). She conversed normally and could follow directions, explain her recent and remote personal history, repeat six digits forward and four in reverse, and remain on task/topic as long as needed. (*Id.*). Claimant reported that she prepared meals, drove occasionally, visited her parents and assisted them with their medication, watched television, did laundry and dusted, completed personal hygiene tasks without assistance, and communicated with others on social media. (*Id.*). Claimant stated that her mood was usually good, and she

did not have a lot of problems with panic attacks. (Tr. at 344). Her medication, Lexapro, reduced the intensity and frequency of the panic attacks from almost daily to every couple of months. (Tr. at 344-45).

The following month, in April 2021, Claimant's rheumatologist suggested medication changes to address Claimant's fibromyalgia. (Tr. at 512). However, Claimant's primary care physician documented in June 2021 that Claimant was doing so well on Lexapro, he was hesitant to discontinue it. (Tr. at 500). He kept Claimant on Lexapro and added Gabapentin for fibromyalgia. (*Id.*). In April 2022, Claimant was stressed over the recent death of her father, but her anxiety remained stable. (Tr. at 651). A psychologist evaluated Claimant that month and cleared her for bariatric surgery. (Tr. at 625). Dr. Lawrence stated that Claimant's depression symptoms were most attributed to sleep as opposed to low mood or anhedonia, and her anxiety was mostly controlled by medication. (*Id.*). These records are all substantiating of the ALJ's findings.

For the above reasons, the undersigned **FINDS** that the ALJ's mental RFC analysis allows for meaningful review, and his findings are supported by substantial evidence.

### C. Subjective Symptoms

Claimant argues that the ALJ did not appropriately evaluate her self-described limitations as required by *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). (ECF No. 10 at 1). In this case, the ALJ performed the two-step process to evaluate Claimant's subjective complaints. He considered Claimant's allegations regarding her right ankle injury, osteoarthritis in her knees, left hip bursitis, pain and soreness in her hands and fingers, shortness of breath due to asthma, fatigue associated with obstructive sleep apnea, lower back pain, and vertigo. (Tr. at 53). The ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged

symptoms. (*Id.*). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the collective record. (*Id.*). The ALJ noted that Claimant's treatment records documented improvement and stability of symptoms with minimal conservative treatment. (*Id.*). Her physical examinations were overwhelmingly normal aside from acute exacerbations of symptoms. (*Id.*). The pain, stiffness, and swelling in her ankle improved with physical therapy. (*Id.*). Her left hip pain improved with conservative medications and physical therapy. (*Id.*). Claimant's asthma was generally asymptomatic and there were no objective findings related to fatigue. (*Id.*). Claimant identifies several alleged flaws in the ALJ's subjective symptom analysis.

### 1. Objective Evidence

Claimant argues that the objective evidence of her osteoarthritis, degenerative disc disease, fibromyalgia, and bursitis supports her described limitations. (ECF No. 10 at 12). She lists the examination findings and imaging that she contends substantiates her allegations, indicating that the ALJ did not adequately consider that evidence. (*Id.* at 12-14). However, the ALJ thoroughly considered the objective evidence of those conditions. Regarding osteoarthritic complaints, the ALJ noted Claimant's limited range of motion and swelling after injuring her right ankle in August 2020, but the ALJ cited evidence that Claimant's symptoms improved with physical therapy. (Tr. at 54). Although she presented with a cane during her consultative examination in March 2021, she could transfer from the chair to the examination table without difficulty or use of the cane; retained normal muscle strength in her lower extremities; could perform tandem gait and heel walking, but could not walk on her tip toes; and had full range of motion in her right ankle. (Tr. at 54-55). The ALJ noted that, by April 2022, Claimant was walking 30 to 45 minutes every

other day for distances of one to two miles. (Tr. at 55).

Regarding Claimant's reported occasional back pain, the ALJ considered various objective evidence, including imaging in December 2021 that showed only mild degenerative changes and examinations throughout the record that revealed normal range of motion in Claimant's back and extremities, strength, and gait. (Tr. at 55-56). The ALJ considered that Claimant was diagnosed with fibromyalgia and generalized osteoarthritis regarding pain in her left elbow, hip, and hands. (Tr. at 55). The ALJ noted that Claimant's physical examinations revealed positive tender point testing. (Tr. at 55). However, she retained normal grip strength, range of motion in her joints, and ambulated with a normal gait at the time of her diagnosis. (*Id*.). Claimant infrequently complained regarding fibromyalgia symptoms and generally had negative examinations and was treated with medication. (Tr. at 58). Finally, the ALJ considered the examination findings and imaging regarding Claimant's bursitis, which resolved by November 2021 after only a few months of physical therapy and medication. (Tr. at 55).

Overall, while Claimant may disagree with the ALJ's evaluation of the evidence, Claimant does not point to any material evidence that the ALJ overlooked, or to any errors that he made in analyzing the record. To the extent that Claimant argues that the ALJ did not expressly mention certain examination findings or imaging, an ALJ is not required to specifically refer to every piece of evidence in the decision; the fact that a record is not mentioned does not mean that it was not considered. *Mary M. v. Kijakazi*, No. 2:23-CV-00444, 2023 WL 8243772, at *9 (S.D.W. Va. Nov. 2, 2023), *report and recommendation adopted,* 2023 WL 8241553 (S.D.W. Va. Nov. 28, 2023) (citing *Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)). Therefore, the undersigned **FINDS** that the ALJ considered all of the objective evidence and provided a well-reasoned analysis of

how that evidence supported and, in some cases, conflicted with Claimant's allegations.

## 2. Daily Activities

Claimant contends that the ALJ's "inapt and highly selective references to the record [regarding Claimant's daily activities] are not substantial evidence supporting the ALJ's denial [of benefits]." (ECF No. 10 at 14). The Fourth Circuit emphasized in *Arakas* that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Arakas*, 983 F.3d at 98 (citation and markings omitted). The Fourth Circuit made clear that an ALJ cannot selectively cite evidence concerning the tasks that a claimant can perform while improperly disregarding qualifying or contrary evidence regarding the claimant's ability to perform those tasks. *Id.* at 100. In that case, the ALJ erred by relying on the activities that the claimant could perform while failing to account for other significant evidence demonstrating the difficulties that she had performing those tasks. *Id.* In *Arakas*, the Fourth Circuit concluded that substantial evidence did not support the ALJ's conclusion that the claimant's subjective complaints were inconsistent with her daily activities, because the record, when read as a whole, revealed no inconsistency between the two. *Id.* In sum, the Fourth Circuit noted that, if the claimant's qualifying statements were properly considered, it was clear that "she could perform only minimal daily activities that in no way suggested any ability to engage in full-time work on a sustained basis." *Id.* at 101.

Here, Claimant takes issue with the fact that the ALJ considered her statement in 2020 that she could stand for one hour, but did not discuss her contemporaneous statement that standing and walking aggravated her symptoms, and her impairments worsened after 2020. (ECF No. 10 at 13). However, this fails to show that the ALJ

selectively relied on certain evidence at the exclusion of contrary evidence. Claimant's statement that standing and walking aggravated her symptoms is not inconsistent with her statement that she could only stand for one hour. As such, Claimant's argument is perplexing. Moreover, as the ALJ cited, Claimant was walking 30 to 45 minutes for distances of between one to two miles in April 2022. (Tr. at 55). That would appear to indicate improvement, not worsening, in those physical functions. Claimant also identifies that the ALJ did not specifically state that she was walking for exercise *every other day* in April 2022. However, the ALJ did not indicate that it was a daily occurrence. There is no error or overstatement of this evidence.

Furthermore, the ALJ did not cite the fact that Claimant was walking for exercise as being determinative of the fact that Claimant could stand/walk for six hours every day, as Claimant argues. (ECF No. 10 at 13-14). Rather, the ALJ considered the consistency of Claimant's daily activities with Claimant's statements concerning the intensity, severity, persistence, and limiting effects of her symptoms. As cited by the ALJ, in July 2022, only a couple of months after Claimant stated to her provider that she was walking one to two miles every other day, Claimant testified during her administrative hearing that she had to sit after walking one-quarter of a mile or standing for 30 minutes due to ankle pain. (Tr. at 53); *see* (Tr. at 72).

In the instant decision, the ALJ did not misrepresent or cherrypick the facts in order to present a false picture of Claimant's abilities. The decision as a whole clearly indicates that the ALJ considered the extent to which Claimant was limited in performing her daily activities and provides a logical bridge to the ALJ's conclusions. There is no rigid requirement that the ALJ explicitly mention every piece of evidence or qualifying statement about the extent to which a claimant can perform daily activities. *Footman v.*

*Kijakazi*, No. 21-1116, 2023 WL 1794156, at *2 (4th Cir. Feb. 7, 2023). The issue that necessitated remand in *Arakas* and similar decisions was that the ALJ overstated and misrepresented claimant's daily activities based on select facts in order to deny disability, and an accurate view of the record as a whole did not support it. *Prudich v. Saul,* No. CV 1:20-00019, 2021 WL 933864, at *6 (S.D.W. Va. Mar. 11, 2021); *Ball v. Kijakazi,* No. 2:21-CV-00027, 2022 WL 883036, at *11 (S.D.W. Va. Mar. 3, 2022), *report and recommendation adopted,* 2022 WL 880004 (S.D.W. Va. Mar. 23, 2022). The "cases make clear that it is insufficient merely to point to minimal daily activities as proof that a claimant is not disabled" because, as the Fourth Circuit explained in *Arakas*, "claimants should not forfeit Social Security benefits for trying to 'participate in the everyday activities of life.'" *Prudich*, 2021 WL 933864, at *7 (quoting *Arakas*, 983 F.3d at 101).

Here, by contrast, Claimant is simply asking the Court to reweigh evidence and reach different conclusions than the ALJ. The ALJ considered the relevant evidence and ultimately determined that the activities that Claimant could perform, even with the limitations that she alleged, supported no greater restrictions. Critically, the ALJ did not adjudge Claimant non-disabled solely based on her ability to perform some activities. It was one of many factors that the ALJ considered in evaluating Claimant's subjective symptoms and RFC. *Cf. Langston v. Comm'r of Soc. Sec. Admin.*, No. 22-1257, 2023 WL 1519521, at *4 (4th Cir. Feb. 3, 2023) (finding error where the ALJ discredited the claimant's assertions of disabling pain based largely on her ability to perform modest daily activities). Therefore, the undersigned **FINDS** no error in the ALJ's analysis of Claimant's daily activities.

### 3.  Other Factors

Claimant points to record evidence of pain in her hands, wrists, feet, ankles, low

back, left elbow, left hip, and left knee, as well as the treatment that she received, including medication; a steroid injection in her hip; physical therapy; sitting with her feet elevated; changing positions to relieve pain; and using ice, rest, and a heating pad for her right ankle pain. (ECF No. 10 at 14). She states that a review of the ALJ's findings shows that he selectively referenced that evidence. (*Id.*). Claimant appears to argue that, if properly considered, that evidence supports a finding that she is disabled. (*Id.*). This argument is without merit. In assessing Claimant's subjective symptoms, the ALJ considered Claimant's pain complaints and treatment modalities in conjunction with all of the evidence in the record. Claimant does not identify any critical conflicting evidence that the ALJ failed to consider in this regard. Again, she simply asks the Court to review the evidence and reach independent conclusions regarding the intensity, persistence, and limiting effects of her symptoms. As noted, that is not the Court's role in reviewing the Commissioner's decision. Accordingly, the undersigned **FINDS** nothing in the ALJ's discussion that warrants reversal or remand.

### 4. Work History

Claimant argues that the ALJ erred in not considering her virtually uninterrupted 43-year work history before filing her claim for DIB. (ECF No. 10 at 15). In evaluating the intensity and persistence of a claimant's symptoms, such as pain, and determining the extent to which the symptoms limit the person's capacity for work, the ALJ considers evidence such a person's work record. 20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2016 WL 1119029, at *5. The ALJ plainly did so in this case. He specifically questioned Claimant about her work history during the administrative hearing and evaluated Claimant's symptoms based on all of the evidence in the record, which included all of the information that Claimant submitted regarding her earnings and work history. (Tr. at 53, 84-86, 215-

18, 236-43). Claimant does not identify any authority which required the ALJ to elaborate on her work history any further. *Lora H. v. Kijakazi*, No. 2:22-CV-00211, 2022 WL 18717795, at *15 (S.D.W. Va. Nov. 2, 2022), *report and recommendation adopted,* 2023 WL 2025239 (S.D.W. Va. Feb. 15, 2023). As such, the undersigned **FINDS** no error in the ALJ's consideration of Claimant's work history.

### 5. Fibromyalgia

As a final matter, Claimant argues that the ALJ improperly increased her burden of proof by requiring her subjective description of her symptoms to be supported by objective medical evidence. (ECF No. 10 at 16).  The undersigned **FINDS** this challenge is similarly unfounded. In *Arakas*, the Fourth Circuit noted that because the claimant was entitled to rely exclusively on subjective evidence to prove that her symptoms were so continuous and/or so severe that they prevented her from working a full eight hour day, the ALJ applied an incorrect legal standard" in discrediting her complaints based on the lack of objective evidence corroborating them. *Arakas*, 983 F.3d at 96 (citation and markings omitted). Thus, the ALJ improperly increased the claimant's burden of proof by effectively requiring her subjective descriptions of her symptoms to be supported by objective medical evidence. *Id.* The Fourth Circuit noted that the legal error was particularly pronounced in a case involving fibromyalgia, a disease which symptoms are entirely subjective with the exception of trigger-point evidence. *Id.* The Court explained that there "are no laboratory tests for the presence or severity of fibromyalgia." *Id.* at 91, 96. In fact, individuals suffering from fibromyalgia will typically have no abnormalities in physical examinations, such as muscle weakness, abnormal reflexes, joint inflammation, or limited range of motion. *Id.* at 91. For that reason, an ALJ cannot discredit a Claimant's fibromyalgia symptoms based on lack of objective evidence because the disease "eludes

such measurement." *Id.* at 96.

In the present matter, the ALJ did not discount Claimant's fibromyalgia based on lack of objective evidence, as was the case in *Arakas*. In fact, the ALJ expressly considered objective evidence to substantiate Claimant's fibromyalgia, noting that Claimant had multiple tender points consistent with Social Security Ruling 12-2p and that fibromyalgia limited Claimant's RFC. (Tr. at 55, 56); *see Charlene S. v. Saul*, No. CV DLB-20-853, 2021 WL 2141501, at *4 (D. Md. May 26, 2021) (discussing that objective evidence cannot be used to discount fibromyalgia symptoms, but it can be used to substantiate it). Although the ALJ considered the functional effects of Claimant's fibromyalgia, which necessarily involved analyzing the objective evidence and other evidence, there no indication that the ALJ discredited Claimant's alleged symptoms based on objective evidence alone. The ALJ expressly considered not only the objective findings in relation to Claimant's pain, but Claimant's statements to providers, methods of treatments, the opinion evidence, and daily activities. The ALJ very clearly did not discredit Claimant's complaints simply based on "lack of objective evidence corroborating them." *Oakes v. Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citation omitted).

For all of the above reasons, the undersigned **FINDS** that the subjective symptom assessment is supported by substantial evidence.

## VIII.  **Proposal and Recommendations**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket

of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 25, 2024

Cheryl A. Eifert
United States Magistrate Judge

36